Jori Lynn SKINNER, Appellant,

v.

Adam Eric HAGBERG, Appellee.

No. S–12504.

Supreme Court of Alaska.

May 16, 2008.

Jori L. Skinner, pro se, Fairbanks.

Adam E. Hagberg, pro se, Anchorage.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

Jori Skinner gave birth to a son in January 2002. She and the child's biological father, Adam Hagberg, never married each other. Skinner filed for sole legal and primary physical custody; Hagberg counterclaimed for shared legal and physical custody. The trial court awarded the parties shared legal custody but awarded Skinner primary physical custody. It then determined Hagberg's child support arrearage from the date genetic testing results confirmed that he was the biological father; set up a twice-monthly visitation schedule and ordered each party to pay fifty percent of the visitation expenses; and conditionally awarded Hagberg the federal income tax dependency exemption for the child. Skinner appeals the rulings on child support arrearage, visitation and related expenses, and the tax exemption.

For the reasons explained below, we reverse the trial court's determination that Hagberg's child support obligation began on the date genetic testing confirmed his paternity and remand for recalculation of the child support arrearage. We affirm the trial court's visitation schedule but remand regarding the calculation and allocation of visitation expenses. We also affirm the trial court's decision to award Hagberg the federal income tax dependency exemption.

## II. FACTS AND PROCEEDINGS

### A. Facts

Jori Skinner gave birth to a son, Adison, on January 10, 2002, after a relationship with Adam Hagberg. Skinner told Hagberg during the pregnancy that he might be the father, but at the time neither of them attempted to confirm paternity. Skinner's husband was named as the father on Adison's birth certificate.

Skinner and her husband separated in March 2003 and divorced in November 2004. Genetic testing conducted in May 2004 ultimately confirmed that Hagberg was Adison's biological father. Beginning in June 2004 and continuing through February 2005, Skinner, who lived in Fairbanks, arranged for Adison to visit Hagberg and his family in Anchorage.

### B. Proceedings

In March 2005 Skinner filed for sole legal and primary physical custody of Adison and for child support. Hagberg, in turn, sought shared legal and physical custody of Adison.

A paternity decree was entered in September 2005 based on the genetic testing results.

Superior Court Judge Charles R. Pengilly issued verbal orders regarding visitation, child support arrearage, and the dependent tax exemption at a custody trial in March 2006. Judge Pengilly awarded the parties shared legal custody of Adison but awarded Skinner primary physical custody. He ruled that Hagberg's child support obligation began on June 1, 2004—when the genetic testing results finally confirmed Hagberg's paternity—rather than on January 10, 2002, Adison's date of birth. He also granted Hagberg visitation rights that included one long weekend visit per month during the school year until Adison began kindergarten. Under this arrangement, Hagberg was entitled to pick up Adison in Fairbanks at noon on Thursdays and was required to return him to Skinner in Fairbanks by eight o'clock on Sunday evenings. Based on Hagberg's testimony, Judge Pengilly estimated that Hagberg's visitation expenses totaled $480 per month. He ordered the parties to share visitation expenses equally, but required Hagberg to pay all the expenses and take a credit against his monthly child support for one-half the expenses actually incurred. Finally, Judge Pengilly awarded Hagberg the federal income tax dependency exemption for Adison, subject to certain conditions.

The case was reassigned to Superior Court Judge Douglas L. Blankenship in April 2006 following Judge Pengilly's retirement. Judge Blankenship held a hearing in July 2006 and issued a written order in September 2006 based primarily on Judge Pengilly's oral rulings. Skinner moved for reconsideration on most issues. Judge Blankenship granted reconsideration on the school year

visitation schedule and the mode of travel, but denied the motion in all other respects. He indicated an inclination to reduce the strain on Adison by requiring that one visit per month be by air. He ordered supplemental briefing but issued no further rulings until March 2007 when the parties were before him regarding a visitation dispute.[1]

Judge Blankenship then issued an order modifying the visitation schedule. He required that one visit per month be by air. He also set child support at $575 per month subject to court or Child Support Services Division (CSSD) modification, and changed the visitation expense framework to account for air travel and to provide that Hagberg's credit for his payment of Skinner's share of visitation expenses applied only to Hagberg's arrearage (and not to his ongoing monthly support payments).[2]

Skinner presents several arguments on appeal. She claims that the trial court erroneously: (1) found that Hagberg's child support obligation arose when genetic testing established his paternity, rather than at Adison's birth; (2) failed to consider Adison's age and the parties' financial capabilities when it set a visitation schedule that required extensive travel; (3) allocated visitation expenses equally between the parties and awarded Hagberg a monthly $240 credit against his child support arrearage; and (4) awarded Hagberg the federal tax exemption for Adison. Skinner also asserts that the trial court denied her equal protection under the law by treating Hagberg more favorably during the proceedings.

## III. STANDARD OF REVIEW

 We review de novo the trial court's determination of the inception date for a

1. In the meantime, Skinner appealed from the trial court's September 2006 order.

2. Judge Pengilly's original oral ruling and Judge Blankenship's September 2006 confirmatory written order provided that Hagberg would receive a reduction in his ongoing monthly child support obligation in the form of a credit for one-half the monthly visitation costs. This well may have been an improper support modification reducing Hagberg's monthly child support, a modification that was unsupported by any material change in circumstances. *Cf.* Alaska R. Civ. P. 90.3(h). Judge Blankenship corrected any such

error by modifying the custody order to indicate that "Father shall be responsible for payment of all the visitation travel expenses *until his child support arrearage is satisfied,* with [the Father] receiving a credit of $240 (for one-half of the estimated travel expenses per month) per month from September through May *against his child support arrearage obligation ....*" (Emphasis added.) This latter approach does not present a problem because any additional sums paid by Hagberg would only be credited to offset his arrears, not deducted from his ongoing monthly child support obligation.

child support obligation.[3] We also review constitutional questions de novo,[4] adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[5] We review the "alleged inadequacy of a trial court's fact findings to determine whether they give a clear indication of the factors considered important by the trial court or allow us to determine from the record what considerations were involved." [6] We review visitation awards,[7] custody arrangements, and the accompanying best-interests determinations for abuse of discretion.[8] Generally, we will conclude that a trial court abused its discretion only when we have a definite and firm conviction, after reviewing the whole record, that it erred in its ruling.[9]

## IV. DISCUSSION

### A. Hagberg's Child Support Obligation Arose at Adison's Birth.

██ The trial court acknowledged "the general law" that a parent's duty of support arises on the date the child is born, but stated that the Commentary to Alaska Civil Rule 90.3 directed it to consider "all relevant

factors," including whether Hagberg knew he had a child support obligation, in determining when Hagberg's duty of support began.[10] The trial court found that Hagberg did not know "in any meaningful sense" that he had a child support obligation until he received the paternity test results dated June 1, 2004, and chose that date for the inception of Hagberg's support obligation. Settled law does not allow this approach.

In *State, Department of Revenue, Child Support Enforcement Division, ex rel. Hawthorne v. Rios,*[11] we held that a biological parent's duty of support begins on the child's date of birth and not when paternity is adjudicated.[12] We specifically noted that paternity adjudication may be a prerequisite to enforcement of a support duty where a child is born out of wedlock, but does not create that duty,[13] and that "a custodial parent's conduct cannot amount to an estoppel or waiver" altering a duty to pay child support.[14] These rules of law are based on the sound policy that fulfillment of statutory support obligations should be encouraged and incentives to avoid or delay such obligations should be discouraged.[15]

---

3. *See Rubright v. Arnold,* 973 P.2d 580, 586 (Alaska 1999); *State, Dep't of Revenue, Child Support Enforcement Div. ex rel. Hawthorne v. Rios,* 938 P.2d 1013, 1015 (Alaska 1997); *Matthews v. Matthews,* 739 P.2d 1298, 1299 (Alaska 1987).

4. *VinZant v. Elam,* 977 P.2d 84, 86 (Alaska 1999).

5. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

6. *Siekawitch v. Siekawitch,* 956 P.2d 447, 451 (Alaska 1998) (citing *Borchgrevink v. Borchgrevink,* 941 P.2d 132,. 137 (Alaska 1997)) (concluding that the trial court's findings adequately revealed its reasoning even though the court did not expressly refer to AS 25.24.150(c), because they provided a clear indication of the factors the court found important).

7. *Lone Wolf v. Lone Wolf,* 741 P.2d 1187, 1190 (Alaska 1987); *see also C.R.B. v. C.C.,* 959 P.2d 375, 384 (Alaska 1998) (applying abuse of discretion standard to allocation of visitation expenses), *overruled on other grounds by Evans v. McTaggart,* 88 P.3d 1078, 1085 (Alaska 2004).

8. *Ginn–Williams v. Williams,* 143 P.3d 949, 952 n. 3 (Alaska 2006).

9. *Vezey v. Green,* 171 P.3d 1125, 1128 (Alaska 2007) (citing *Sengupta v. Univ. of Alaska,* 21 P.3d 1240, 1248 (Alaska 2001)).

10. Comment VI.E.1 to Alaska Civil Rule 90.3 states:

It will sometimes be necessary for the court to establish support for a time when no complaint or petition for support had yet been served, and there was no other court or administrative order in effect. The court has determined that Civil Rule 90.3 applies to such calculations. *Vachon v. Pugliese,* 931 P.2d 371, 381–[8]2 (Alaska 1996). However, in some circumstances unfairness may result from rigid application of the rule. The court should consider all relevant factors in such a situation, including whether the obligor was aware of the support obligation, especially if the obligor had children subsequent to that child.

11. *State, Dep't of Revenue, Child Support Enforcement Div. ex rel. Hawthorne v. Rios,* 938 P.2d 1013 (Alaska 1997).

12. *Id.* at 1015.

13. *Id.*

14. *Id.* at 1017 n. 8.

15. *See id.* at 1015.

In *Rubright v. Arnold*,[16] we faced facts very much like those now before us. There, a mother sued her child's biological father to establish paternity and to obtain past and future child support from him, even though she had been and still was married to another man who was listed as the father on the child's birth certificate.[17] We noted that *Rios's* principles were well-established and held that the biological father's duty of support arose at the child's birth.[18] We acknowledged potential unfairness in some cases, such as where a biological father has no notice of his paternity until many years after his child's birth and the ensuing support arrearage is economically crushing:

> The father may have no means, except avoiding conception, of protecting himself. Large and unexpected liabilities can be the logical consequence of the rule that a biological father is liable for the support of a child from birth, especially when past arrearages are based on the child support guidelines set out in Civil Rule 90.3, rather than on reimbursement of past expenses.[19]

We nonetheless emphasized that relief from the rule's potentially harsh consequences must come from the Legislature.[20] No legislative relief has arrived, and our case law is clear: the duty of parental support begins on the date of the child's birth.[21] Neither Civil Rule 90.3 nor the Commentary grants a trial court discretion to adjust the effective date of a parental child support

obligation. Civil Rule 90.3(c)(1) permits the trial court discretion to "vary the child support award *as calculated*" under Rule 90.3 in "unusual circumstances" when manifest injustice would result if the award were not varied.[22] Read together with Civil Rule 90.3(c)(1), the Commentary relied on by the trial court refers only to limited circumstances in which the trial court may consider all relevant factors in deciding whether it is appropriate to deviate from the Civil Rule 90.3 calculation of the *amount* of retroactive support due from the date of birth.[23]

Accordingly, we reverse the ruling that Hagberg's child support obligation began on June 1, 2004. As a matter of law, Hagberg's support obligation began on January 10, 2002. Absent written findings of "unusual circumstances" not presently evident from the record, on remand the trial court should determine Hagberg's retroactive support obligation under Civil Rule 90.3.

## B. Visitation–Related Issues

Skinner raises two primary objections to the trial court's rulings on visitation. First, she asserts the trial court abused its discretion by failing to consider Adison's age and the parties' financial capabilities when it set a visitation schedule that required extensive road and air travel. Second, she asserts the trial court abused its discretion when it allocated visitation expenses equally between the parties and awarded Hagberg a monthly

---

**16.** *Rubright v. Arnold,* 973 P.2d 580 (Alaska 1999).

**17.** *Id.* at 581–82.

**18.** *Id.* at 586.

**19.** *Id.; see also Vachon v. Pugliese,* 931 P.2d at 381–82 (decided after Civil Rule 90.3 came into existence and holding that "absent extraordinary circumstances," the support calculations of Rule 90.3 should be used to determine past child support obligations).

**20.** *Rubright,* 973 P.2d at 586.

**21.** *Id.; Rios,* 938 P.2d at 1015; *Matthews,* 739 P.2d at 1299.

**22.** Alaska R. Civ. P. 90.3(c)(1) (emphasis added). Civil Rule 90.3(c)(1) provides:

> The court may vary the child support award as calculated under the other provisions of this rule for good cause upon proof by clear and convincing evidence that manifest injustice would result if the support award were not varied. The court must specify in writing the reason for the variation, the amount of support which would have been required but for the variation, and the estimated value of any property conveyed instead of support calculated under the other provisions of this rule. Good cause may include a finding that unusual circumstances exist which require variation of the award in order to award an amount of support which is just and proper for the parties to contribute toward the nurture and education of their children. The court shall consider the custodial parent's income in this determination.

**23.** Alaska R. Civ. P. 90.3, cmt. VI.E.1; *see supra* note 10.

$240 credit against his child support arrearage.

### 1. The visitation schedule's effect on Adison

█ Skinner argues that the trial court erred in ordering a visitation schedule requiring Adison, who was only four at the time of trial, to travel back and forth between Fairbanks and Anchorage twice a month. She asserts that the trial court failed to properly consider the "emotionally staggering" effects on Adison from the long and frequent travel, the extended periods away from Fairbanks, and the continual adjustments to be made by going back and forth between the families, especially when Adison hardly knew the Hagberg family.

The record reflects that the trial court heard and considered the factors relevant to determining an appropriate visitation schedule. Judge Pengilly heard Skinner's concerns about the extent of road travel that the visitation schedule would involve. He also heard extensive testimony from a custody investigator about Adison's emotional, mental, and social needs and how visitation would affect those needs. After observing that all the adults involved in Adison's life were reasonable people who were capable of meeting Adison's best interests, Judge Pengilly determined that Hagberg and his family were willing to be flexible to make the visitation work smoothly for Adison.

Judge Blankenship's March 2007 written order reflects that he further considered Adison's best interests when he ordered travel by air once per month. After expressing concern about "Adison driving up and down the highway twice a month," Judge Blankenship stated that flying once per month "should be better for Adison." Judge Blankenship then explored whether other options might "keep Adison from doing the trek between Fairbanks and Anchorage." Judge Blankenship ultimately stated he would order that Adison fly one trip per month.

Notwithstanding the daunting logistics of the visitation schedule and Adison's young age, the trial court did consider Adison's best interests, and after reviewing the whole record, we are unable to conclude that the trial court erred. We therefore affirm the trial court's visitation schedule.[24]

### 2. The allocation of visitation expenses

Skinner argues that the trial court erred when it: (1) ordered the parties to share visitation expenses equally without consideration for their respective financial circumstances; (2) arbitrarily found Hagberg's visitation expenses were $480 per month; and (3) required Hagberg to pay all of Adison's visitation expenses as long as Hagberg was in arrears, but then granted him a monthly $240 credit against his arrearage for half the expenses. The main thrust of Skinner's argument is that in light of the parties' respective financial positions and the significant visitation expenses, Hagberg's child support payments do little more than fund his visits with Adison. When Hagberg's arrearage ultimately is satisfied, Skinner will need to use a substantial portion of Hagberg's child support payments simply to pay her half of the visitation expenses.

Skinner raises legitimate concerns about the trial court's treatment of visitation expenses. As she correctly points out, Civil Rule 90.3(g) provides that the trial court shall allocate reasonable travel expenses between the parties as may be just and proper only *after* it calculates child support payments under Rule 90.3. It appears here that the trial court allocated travel expenses equally between the parties even before CSSD calculated and instituted the final child support award. Even as late as the March 2007 hearing, Hagberg apparently was under a temporary child support order pending final determination by CSSD.

Given the scant information in the record about the parties' respective financial positions and the ultimate amount of Hagberg's

---

**24.** Nevertheless, we note that Adison now is six years old. He likely will start kindergarten this year, at which time the court-ordered visitation schedule changes significantly. On remand regarding the child support calculation issues, the parties and the trial court will be in a good position to evaluate the current visitation schedule and determine whether adjustments in the upcoming schedule are appropriate.

past and future child support payments, we are not in a position to determine whether the trial court's rulings on visitation expenses were appropriately within its discretion. We remand to the trial court to allocate the burden of Adison's visitation expenses after calculating the child support award under Civil Rule 90.3 to account for Hagberg's arrearage based on Adison's date of birth and considering the totality of the child support payments and the parties' respective financial positions.

Skinner also raises legitimate concerns about the trial court's approach of granting Hagberg a specified per-visit credit against his arrears based only on estimated travel costs. Skinner argues that because nearly $5,000 was credited against Hagberg's support arrearage for travel expenses, "[d]ue process would then dictate a separate hearing to be held on actual dates of travel and proof of costs, rather than an individual's 'best guess' or thought process of such travel." Skinner correctly points out that Adison is entitled to receive the full ordered amount of child support,[25] and any excess credit against Hagberg's arrearage that results in an underpayment would violate Adison's right to support. Thus, any credit for payment of Skinner's share of visitation expenses must be on a dollar-for-dollar basis, although the court is free to cap the extent of the offset.

Moreover, it should not be Skinner's responsibility to account for Hagberg's visitation expenses. While the March 2007 order modifying custody appropriately requires that Hagberg provide Skinner with proof of plane ticket expenses, it should not be Skinner's obligation to advise CSSD of the amount of Hagberg's monthly expenses or whether Hagberg took advantage of all of his scheduled visits. It is unclear why Hagberg, who is responsible for the arrears and who is incurring the travel expenses, is not best suited to perform this accounting function.

On remand, the trial court should ensure that all past credits against Hagberg's arrears for Skinner's portion of visitation costs were on a dollar-for-dollar basis, not based on a predetermined estimated credit, and that Hagberg in the future receive credit only for his actual expenditures upon sending receipts for such visitation to CSSD and Skinner. In this way, CSSD can ensure that Adison's right to child support is not compromised by an underpayment.

### C. It Was Not an Abuse of Discretion To Conditionally Allocate the Federal Tax Exemption to Hagberg.

■ Skinner asserts that the trial court abused its discretion when it awarded Hagberg the federal tax exemption for Adison because she has primary physical custody. Civil Rule 90.3(k) provides that consistent with AS 25.24.152[26] and federal law, the trial court may allocate the federal tax exemption for a child between the parties "as is just and proper and in the child's best interests." Here, the trial court allocated the exemption as follows:

Father may claim Adison as a dependent for federal tax purposes if Father satisfies the requirements of federal law and is not in arrears at the end of the tax year in an amount more than four times his monthly child support obligation. If, in the future, Mother permanently reenters the workplace, the parties will alternate claiming

**25.** *State, Dep't of Revenue, Child Support Enforcement Div. ex rel. Valdez v. Valdez,* 941 P.2d 144, 154 n. 14 (Alaska 1997) ("The right to support is that of the child and thus cannot be waived by CSED.").

**26.** AS 25.24.152(a) provides:
(a) In an action for divorce, dissolution, or to declare a marriage void, the court *may not unconditionally grant to a noncustodial parent the right to claim a child as a dependent* under federal income tax laws. The court *may grant a noncustodial parent the right to claim a child as a dependent under federal tax laws for a tax year if the noncustodial parent satisfies the re-*

*quirements of federal law and was not in arrears at the end of the tax year in an amount more than four times the monthly obligation* under (1) a support order applicable to the child in cases where a payment schedule has not been established for payment of continuing support and accumulated arrears under the support order; or
(2) a payment schedule if a payment schedule has been established for payment of continuing support and accumulated arrears under a support order applicable to the child.
(Emphasis added.)

Adison as a dependent for federal tax purposes. Mother will be entitled to take the federal tax deduction for the first calendar year in which she obtains permanent employment and works at least twenty-four weeks. For example, if she obtains permanent employment of at least twenty-four weeks in 2007, she would be able to take the deduction for Adison for tax year 2007.

The allocation complies with the statute and the rule, and on the record before us, we conclude that the trial court did not err. The trial court nonetheless will have an opportunity on remand to determine whether this allocation remains appropriate after revisiting the child support and visitation expense issues discussed above.

### D. No Equal Protection Violation Occurred.

Skinner claims that because the trial court found in favor of Hagberg on most of the issues at trial, her constitutional right to equal protection under the law was violated. Equal protection under the law does not mean that the trial court is obligated to come to some rough equivalency in the number of rulings favoring each side of a dispute. Our independent review of the record reveals no evidence of a deliberate plan to discriminate against Skinner on some unjustifiable basis or arbitrary classification, and there is no basis to reverse any of the trial court's rulings on equal protection grounds.[27] We therefore conclude that her claim is without merit.

## V. CONCLUSION

We REVERSE the trial court's determination that Hagberg's child support obligation began on the date genetic testing confirmed his paternity, hold as a matter of law that Hagberg's child support obligation began on January 10, 2002, the date of Adison's birth, and REMAND for recalculation of Hagberg's child support arrearage. We AFFIRM the trial court's visitation schedule but REMAND regarding the calculation and allocation of visitation expenses. Finally, we AFFIRM the trial court's decision to award

Hagberg the federal income tax dependency exemption.

MATTHEWS, Justice, not participating.

---

**27.** *See VinZant v. Elam,* 977 P.2d 84, 87 (Alaska 1999).